**Eric JENKINS, Petitioner–Appellee–Cross–Appellant,**

**v.**

**Christopher ARTUZ, Superintendent, Respondent–Appellant–Cross–Appellee.**

**Docket Nos. 01–2328, 01–2355.**

United States Court of Appeals, Second Circuit.

Argued: Jan. 11, 2002.

Decided: April 1, 2002.

---

Donna Aldea, Assistant District Attorney (Richard A. Brown, District Attorney, Queens County, John M. Castello, Assistant District Attorney, Lisa Ann Drury, Assistant District Attorney, of counsel), Kew Gardens, NY, for Respondent–Appellant–Cross–Appellee.

Frederick H. Cohn (Laura K. Gasiorowski, of counsel), New York, NY, for Petitioner–Appellee–Cross–Appellant.

Before: SACK, B.D. PARKER, JR. and B. FLETCHER,* Circuit Judges.

SACK, Circuit Judge.

Respondent Christopher Artuz, Superintendent of Green Haven Correctional Facility, Dutchess County, New York, appeals from a judgment of the United States District Court for the Eastern District of New York (Nina Gershon, *Judge*) granting petitioner Eric Jenkins's petition for a writ of habeas corpus under 28 U.S.C. § 2254. In granting Jenkins's petition, the district court engaged in *de novo* review because it concluded that the Appellate Division, Second Department, of the New York Supreme Court had not, on direct appeal, "adjudicated [the federal constitutional claim] on the merits" under 28 U.S.C. § 2254(d). Subsequent to Judge Gershon's decision, however, we clarified the meaning of "adjudicated on the merits." *See Sellan v. Kuhlman,* 261 F.3d 303 (2d Cir.2001). We hold that under *Sellan,* Jenkins's claim was adjudicated on the merits, and the more deferential standard of review set forth at 28 U.S.C. § 2254(d) therefore applies to the state court's decision. We hold nonetheless that the writ should issue because the Appellate Division's denial of Jenkins's federal due process claim relating to the use of false testimony against him was an unreason-

---

* The Honorable Betty B. Fletcher of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

able application of clearly established federal law as determined by the Supreme Court of the United States.

## BACKGROUND

At about 8:45 p.m. on April 11, 1992, Michael Reese was killed by gunshot wounds inflicted on him while he stood at or near a bus-stop shelter on Guy R. Brewer Boulevard in the Borough of Queens, New York. On May 12, 1992, police arrested Jenkins and charged him with the killing.

### I.   State Court Proceedings

#### A.   *The Suppression Hearing and the First Trial*

In a March 1, 1993 pretrial hearing, Jenkins moved to suppress in-court identification testimony from two potential witnesses, Garvey Napoleon and Rollie Carter. New York Supreme Court Justice John J. Leahy rejected Jenkins's motions without explanation.

Jenkins proceeded to trial before Supreme Court Justice Joseph Rosenzweig on May 5, 1993. On May 11, Queens County Assistant District Attorney ("ADA") Solomon Landa, who was prosecuting Jenkins's case, entered into an oral plea agreement with a prosecution witness, David Morgan, who was to testify later that day. Morgan had been arrested twice for selling crack cocaine in a matter unrelated to the *Jenkins* case[1] and had been charged with possession thereof with intent to sell. Under the agreement, Morgan accepted six months' imprisonment and five years' probation. Later that day, in court, Jenkins's counsel objected that he had not been warned of Morgan's plea bargain. Justice Rosenzweig declared a

mistrial the following day based on ADA Landa's "prosecutorial misconduct" in "hold[ing] back exculpatory information [that is, Morgan's plea] as long as possible" from defense counsel.

#### B.   *The Second Trial*

ADA Therese Lendino replaced Landa as the prosecutor in the case. On September 22, 1993, Jenkins's second trial began before Supreme Court Justice William G. Giaccio. Lendino acknowledged to the court at the trial's outset that the State and Morgan had entered a plea agreement, as a condition of which he had agreed to cooperate and testify truthfully and fully, and that she "expect[ed] it w[ould] come out on direct [examination]."

The State presented eight witnesses, six of whom provided no evidence directly linking Jenkins to Reese's murder. Four police officers—Evola, Ritter, Casella, and Gibbons—testified about the crime scene and the gathering of evidence. Medical examiner Dr. Josette Montas testified as to the cause of death. And Reese's mother testified as to her identification of the body.

Garvey Napoleon also testified for the prosecution. He gave a purported eyewitness account of the murder, saying that at the time of the killing he was talking to his girlfriend using a pay phone on Guy R. Brewer Boulevard across from where Reese stood at the bus stop. Napoleon testified that he saw Jenkins, accompanied by two others, approach Reese and shoot him.

Napoleon's testimony contained a number of inconsistencies. For example, Napoleon gave two different names for his girlfriend—Devanya and Jennifer. He

---

1.   The dates of Morgan's arrests are unclear from the record; he testified his first arrest occurred in either February 1992 or May

1992, and that the second arrest occurred in February 1993. The precise crimes for which he was indicted are similarly unclear.

also alternated between saying he had and had not been speaking to her at the moment when Morgan was shot. He also failed at first to report seeing Jenkins's gun. Finally, at the first trial, he claimed to have walked across Guy R. Brewer Boulevard toward Reese's body after the shooting, but denied doing so at the second trial.

David Morgan then testified for the prosecution. He said that the day before the murder he had witnessed a fight between Jenkins's nephew, Cecil Saddler, Jr., and the murder victim, Reese. Morgan testified that Jenkins later approached Morgan and asked about Reese, and that Jenkins stated that he was "sick of people bothering his nephew." Morgan also testified that he learned of the murder soon after it occurred, found the victim's mother, and brought her to the murder scene.

In the course of direct examination, ADA Lendino asked Morgan no questions about his plea agreement with the State as she had previously suggested she would. During the defense counsel's cross-examination, however, Morgan falsely denied its existence:

Q: And before you testified, your attorney and Mr. Landa [the prosecutor in the first trial] worked out a deal; is that correct?

A: No, that is not correct.

Q: That's not correct?

A: No.

Q: Did you and your attorney work out a deal that for these two Class 'B' felonies you were going to take a plea; is that right?

A: No.

Q: That's not true?

A: No, it's not.

. . .

Q: Before you testified in the proceedings on May 11th, 1993, you were promised and got an offer from the Assistant District Attorney Mr. Landa that if you pled guilty to those charges you would get six months in jail and probation?

Before Morgan could answer, ADA Lendino objected that the question had been "[a]sked and answered." The court overruled the objection, and defense counsel continued:

Q: That was a deal you worked out?

A: It wasn't no deal. That's what they offered me.

Q: That's the first time you got an offer on these two charges?

A: No, it wasn't. I had got a three months and a YO [Youthful Offender status] the first time.

Q: You mean on the first case.

A: No. They put them together and that's what they gave me and I had took [sic] it to Court and they gave me six months and five years.... They gave me six months and five years probation.

Q: On both charges?

A: Yes. And I took that.

Q: But you got that offer while you were in this building, in this court, on May 11th 1993.

A: No, I didn't.

Q: .... Do you recall in May of 1993 that you were sworn to tell the truth in these proceedings?

A: Yes.

Q: And do you remember being asked certain questions and giving certain answers?

A: Yes.

Q: And you were sworn to tell the truth. Do you remember being asked this question ... "*QUESTION:* Okay, now did I tell you today in the presence of your lawyer what kind of

deal you would get? *ANSWER:* Yes." Do you recall being asked that question and giving that answer?

A: When I was in here before, I was nervous—

Q: Do you recall being asked that question and giving that answer, sir?

A: Yes, I guess so. I forgot really.

Q: I have no further questions.

On redirect examination, ADA Lendino did not seek to correct her witness's at-best-ambiguous testimony about the existence of a plea agreement. Instead, she reenforced the impression that no agreement existed:

Q: David, have I ever met with you before today?

A: No.

Q: Did you make any deals with me?

A: No.

The prosecution then rested.

Alnita Saddler and her former husband Cecil Saddler testified for the defense. They said that they were with Jenkins in Alnita's apartment on the night that Reese was killed, celebrating their son Cecil Saddler, Jr.'s birthday. They admitted, however, that Jenkins and their son left for Alabama a week after Jenkins was questioned by police about Reese's murder. Defense counsel also called a telephone company employee who testified that the pay phone at the crime scene where Napoleon asserted he had received a call from his girlfriend could not receive calls. Finally, defense counsel called two police detectives, O'Donnell and Gibbons, to attempt to show contradictions in Napoleon's and Morgan's testimony.

Later, in the course of her summation, ADA Lendino reminded the jury of Morgan's testimony on the absence of a deal between them. She stated that Morgan "sold drugs twice, he got arrested, he pleaded guilty, he went to jail. Never met me before he testified, never made a deal with me." ADA Lendino posed a series of rhetorical questions about Morgan's motives: "Why should David lie? What is the motive for David to lie? You didn't hear anything about any bad blood between David and the defendant. Why lie if there's no reason to lie?" Jenkins's counsel failed either to object or to raise Morgan's plea agreement in his summation. Instead, defense counsel impugned Morgan's credibility by describing him as a "drug dealer."

The jury convicted Jenkins of Murder in the Second Degree and Criminal Possession of a Weapon in the Second Decree. *See* N.Y. Penal Law §§ 125.25, 265.03. He received concurrent prison sentences of fifteen years to life for the murder conviction, and three to nine years for the weapons possession conviction.

## C. State Appellate Proceedings

Before the Appellate Division, Jenkins claimed, *inter alia,* that he had been denied due process by the State's failure to correct Morgan's false testimony, that his right to confront witnesses had been abrogated, and that his right to effective assistance of counsel had been denied. In his brief, Jenkins cited *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), as support for the proposition that his due process rights had been violated. *Napue* addresses the federal constitutional implications of a witness's false testimony that the State did not promise leniency in exchange for his truthful testimony. In dismissing all of Jenkins's claims, however, the Appellate Division discussed only Jenkins's claim of impermissibly suggestive identification. The court dismissed Jenkins's remaining claims, including prosecutorial misconduct, simply by denying them as "without merit." *People v. Jenkins,* 646 N.Y.S.2d 535, 536, 230 A.D.2d 806, 807 (2d

Dep't 1996). Leave to appeal to the Court of Appeals was denied. *People v. Jenkins,* 88 N.Y.2d 1069, 651 N.Y.S.2d 413, 674 N.E.2d 343 (1996) (Smith, *J.*). The Appellate Division thereafter dismissed Jenkins's petition for a writ of *coram nobis* claiming ineffective assistance of appellate counsel. *People v. Jenkins,* 665 N.Y.S.2d 583, 245 A.D.2d 389 (2d Dep't 1997).

## II. Federal Habeas Corpus Proceedings

On January 8, 1998, Jenkins, acting *pro se,* filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Eastern District of New York. In his petition, he contended that: (1) Napoleon's in-court identification testimony was tainted by impermissibly suggestive pretrial identification procedures; (2) his appellate counsel was ineffective for not arguing ineffective assistance of trial counsel on the basis of his failure to reopen the pretrial suppression hearing; (3) he was denied the right to confront witnesses and effective assistance of trial counsel by the trial court's curtailment of defense counsel's cross-examination of Napoleon; and (4) the ADA's failure to correct Morgan's false testimony about his plea bargain and her reinforcement of this testimony constituted prosecutorial misconduct in violation of his Fourteenth Amendment right to due process. Judge Gershon appointed counsel to brief the fourth claim.

In its opinion on Jenkins's direct appeal, as we have noted, the Appellate Division did not discuss the issue of prosecutorial misconduct. Under the then-prevailing rule of *Washington v. Schriver,* 240 F.3d 101, 108–09 (2d Cir.2001), the district court held that the Appellate Division had therefore not adjudicated Jenkins's federal constitutional due process claim on the merits and that the rule of deference to state

court determinations of federal constitutional issues contained in 28 U.S.C. § 2254(d) was thus inapplicable. The district court therefore reviewed the issue *de novo.* It concluded that ADA Lendino's behavior during the second trial was "improper and, when considered cumulatively, severe," insofar as the prosecutor failed to correct Morgan's omission from his testimony of his plea bargain with ADA Landa. *Jenkins v. Artuz,* No. 98–CV–277, op. at 27 (S.D.N.Y. May 16, 2001). The court also concluded that Lendino "engaged in a pattern of misconduct that was designed to conceal the existence of that same cooperation agreement during [that] trial." *Id.* at 28. The court declined to find that defense counsel's failure to respond to these errors required dismissal of the petition. Rather, the court held that it was merely one "factor[ ] to be taken into consideration," particularly because the record suggested that Jenkins's counsel did not know the plea agreement's details. *Id.* at 29. Finally, the court observed that Justice Giaccio knew of the plea bargain but failed to address the issue, and that absent Morgan's testimony, only weakly probative evidence against Jenkins remained. *Id.*

The district court granted the writ on the basis of prosecutorial misconduct. The respondent now appeals.

## DISCUSSION

### I. Standard of Review

▮ We review the district court's grant of a writ of habeas corpus *de novo. Lurie v. Wittner,* 228 F.3d 113, 121 (2d Cir.2000); *Maldonado v. Scully,* 86 F.3d 32, 35 (2d Cir.1996). But "[w]e review a district court's factual findings for clear error." *Morris v. Reynolds,* 264 F.3d 38, 45 (2d Cir.2001).

## II. The Standard of Review of State Court Judgments in Habeas Proceedings

Jenkins's habeas corpus petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 ("AEDPA"), because he filed his petition after April 24, 1996, the AEDPA's effective date. *See Pavel v. Hollins*, 261 F.3d 210, 215 (2d Cir.2001). The AEDPA states in pertinent part:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. . . .

28 U.S.C. § 2254(d)(1).

The AEDPA "place[d] a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus," but only "with respect to claims adjudicated on the merits in state court." *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (opinion of O'Connor, *J.*). When the district court entered judgment in the instant case, *Washington v. Schriver*, 240 F.3d 101, 108–09 (2d Cir.2001), provided this Court's definition of "adjudicated on the merits." Under this version of *Schriver*, "deference [to a state appellate court was only] due when [it], for example, discuss[ed] or at least cite[d] Supreme Court case law or state court decisions which refer to federal law." *Id.* at 109. Subsequently, after the decision by the district court in the case now before us, we withdrew that version of *Schriver*

and substituted a new opinion in which we declined to reach the issue of "§ 2254(d)'s standard of review ... because nothing turn[ed] on it." *Washington v. Schriver*, 255 F.3d 45, 55 (2d Cir.2001) (concluding that irrespective of whether or not post-AEDPA deferential review applied, the district court properly denied the writ).

■ Two months later, we revisited this issue. We decided that a state court adjudicates a claim on the merits "when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment ... even if the state court does not explicitly refer to either the federal claim or to relevant federal case law." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir.2001). To determine whether a state court disposition is "on the merits," we ask " '(1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits.' " *Id.* at 314 (quoting *Mercadel v. Cain*, 179 F.3d 271, 274 (5th Cir. 1999)); *accord Morris*, 264 F.3d at 46.

■ The Appellate Division dismissed Jenkins's assertions under the Due Process Clause of the Fourteenth Amendment, including the claim of prosecutorial misconduct, as "without merit." *Jenkins*, 646 N.Y.S.2d at 536, 230 A.D.2d at 807. In *Sellan*, we found that an even more concise Appellate Division disposition—the word "denied"—triggered AEDPA deference. *Sellan*, 261 F.3d at 314. The Appellate Division in this case therefore adjudicated the due process question "on the merits." Because it also reduced its ruling to judgment, we apply AEDPA deference to its decision.

### III. "Clearly Established Federal Law"

■ Initially, we must determine whether Jenkins's claim is based on "federal law 'clearly established' by the Supreme Court." *Sellan,* 261 F.3d at 309; *see also Williams,* 529 U.S. at 391, 120 S.Ct. 1495 (opinion of Stevens, *J.*) (asking whether application of a particular rule is "dictated" by a Supreme Court decision) (internal quotation marks omitted). We are "constrained to apply 'clearly established Federal law,' as determined by the holdings, not dicta, of the United States Supreme Court." *Morris,* 264 F.3d at 46.

The district court premised its grant of the writ upon two Supreme Court holdings that indeed suffice to meet the "clearly established law" standard of 28 U.S.C. § 2254. First, it relied upon *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), for the proposition that the Due Process Clause of the Fourteenth Amendment is violated when prosecutorial misconduct "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 181, 106 S.Ct. 2464 (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)) (internal quotation marks omitted). Second, it relied upon *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), which holds that "a conviction obtained through use of false evidence, [including evidence going to a witness's credibility] known to be such by representatives of the State, must fall under the Fourteenth Amendment." We also note that the Supreme Court has established that only evidence "material" under *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that could "in any reasonable likelihood ... affect[ ] the judgment of the jury" precipitates due process scrutiny. *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (quoting *Napue,* 360 U.S. at 271, 79 S.Ct. 1173) (internal quotation marks omitted); *accord Mills v. Scully,* 826 F.2d 1192, 1195 (2d Cir.1987).

### IV. The "Unreasonable Application" Standard

■ Habeas corpus relief under 28 U.S.C. § 2254 is warranted only when (1) "the state court identifies the correct governing legal rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case"; or (2) "the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams,* 529 U.S. at 407, 120 S.Ct. 1495 (opinion of O'Connor, *J.*). In asking "whether the state court's application of clearly established federal law was objectively unreasonable," *id.* at 409, 120 S.Ct. 1495, we search for "[s]ome increment of incorrectness beyond error." *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000). This "increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Id.* (citation and internal quotation marks omitted).

We conclude for reasons stated below that Jenkins has indeed identified an unreasonable application of federal law in the Appellate Division's denial of relief under *Napue* and *Giglio.* We thus need not address whether what the district court recognized to be the more stringent standard of *Darden* and *Donnelly* would be met under AEDPA deference to the Appellate Division's decision.

### V. The Unreasonable Application of *Napue* and *Giglio*

■ "[D]eliberate deception of a court and jurors by the presentation of known

false evidence is incompatible with rudimentary demands of justice." *Giglio*, 405 U.S. at 153, 92 S.Ct. 763 (citation and internal quotation marks omitted); *accord United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) ("[T]he [Supreme] Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.") (internal citations omitted); *Napue*, 360 U.S. at 269, 79 S.Ct. 1173 ("[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.") (citations omitted); *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935) (condemning "deliberate deception of court and jury by the presentation of testimony known to be perjured"); *cf. Brady*, 373 U.S. at 87, 83 S.Ct. 1194 (noting that nondisclosure by a prosecutor violates due process when the suppressed evidence is material to guilt).

> The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.

*Napue*, 360 U.S. at 269, 79 S.Ct. 1173.

The Appellate Division unreasonably applied these holdings because the prosecution's knowing use of Morgan's false testimony could reasonably have affected the trial's outcome. Any doubts we might have about the existence of an "increment of incorrectness beyond error," *Francis S.*, 221 F.3d at 111, are eliminated by ADA Lendino's summation, which placed the State's credibility behind Morgan's untruthful testimony.

### A. Morgan's Cross Examination and Re–Direct

*Napue* involved a witness who "had falsely testified that he had been promised no consideration for his testimony." *Napue*, 360 U.S. at 267, 79 S.Ct. 1173. The witness testified falsely that a prosecutor had not promised to recommend a reduction of his already imposed sentence. *Id.* at 266, 79 S.Ct. 1173.

The case at bar presents similar facts. While we cannot determine on the record before us precise details of Morgan's plea or the underlying crimes to which he pled, the respondent concedes that an agreement was made and, of course, that it knew of the agreement during the second trial. On cross examination, Morgan denied any deal with the State:

> Q: And before you testified, your attorney and Mr. Landa [the prosecutor in the first trial] worked out a deal; is that correct?
>
> A: No, that is not correct.

Only when confronted with his previous testimony did Morgan concede the plea's existence, but still he maintained it "wasn't no deal," only "what they offered me." That tepid admission tended more to preclude than to suggest a *quid pro quo* exchange of testimony for leniency. Reasonable jurors would have had to make a considerable inferential leap to conclude

from that exchange that Morgan's testimony was the subject of a bargain with the State. We think it far more likely that jurors would have concluded that Jenkins's counsel tried but failed to establish that a deal had been made. The respondent's suggestion on appeal that Jenkins's counsel "effectively" drew forth the plea agreement's existence is without support.

ADA Lendino did nothing to correct this false impression. To the contrary, she further misled the jury. During cross-examination, she sought to foreclose defense counsel's inquiry into the plea agreement by objecting on the ground that his questions about it had already been asked and answered. On redirect examination, her questions, while eliciting technically accurate testimony, were phrased so as to reenforce the false impression that no deal had been made:

Q: David, have I ever met with you before today?

A: No.

Q: Did you make any deals with me?

A: No.

That testimony was probably true but surely misleading. ADA Lendino did not follow up by eliciting testimony that although Morgan had made no deal with her, he had indeed reached one with another member of the District Attorney's office. As the district court correctly observed, the jury was left with "the mistaken impression that Mr. Morgan had no cooperation agreement with the State...." *Jenkins*, No. 98–CV–277, op. at 28.

**B. The Prosecutor's Summation**

■ Standing alone, a prosecutor's comments upon summation can "so infect[ a] trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181, 106 S.Ct. 2464 (quoting *Donnelly*, 416 U.S. at 643, 94 S.Ct. 1868) (internal quotation marks omitted); *see also Mills*, 826 F.2d at 1195 ("[T]here may be a deprivation of due process if the prosecutor reinforces the deception by capitalizing on it in closing argument...."). The *Darden* Court declined to find so fatal a flaw in the proceedings it reviewed, in part because "the prosecutor's argument [there] did not manipulate or misstate the evidence," and in part because the prosecutor's objectionable comments—describing the defendant as an animal and wishing that he had been shot during the crime—were "invited by or [were] responsive to the opening summation of the defense." 477 U.S. at 181–82, 106 S.Ct. 2464; *see also United States v. Young*, 470 U.S. 1, 11–13, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (explaining the "invited response" rule).

ADA Lendino, by contrast, bolstered Morgan's credibility in the course of her summation by falsely suggesting the absence of a deal between Morgan and the prosecution. "He sold drugs twice, he got arrested, he pleaded guilty, he went to jail. Never met me before he testified, never made a deal with me." Noting that there was no "bad blood between [Morgan] and the defendant," she asked the jury to conclude that Morgan had no reason to lie. That a statement standing alone is factually correct obviously does not mean that it cannot mislead based on the natural and reasonable inferences it invites. ADA Lendino's attempt to hide Morgan's plea agreement from the jury and to use the false impression of its absence to bolster his credibility leaves us with no doubt that her behavior violated Jenkins's due process rights.

We need not determine whether ADA Lendino's summation independently abridged Jenkins's due process rights. It plainly sharpened the prejudice resulting from the use of Morgan's initial untruthful testimony. The advocacy shown in the

record at hand "has no place in the administration of justice and should neither be permitted nor rewarded...." *Young,* 470 U.S. at 9, 105 S.Ct. 1038.

### C. The Cumulative Effect of False Testimony

There is a "reasonable likelihood that [Morgan's] false testimony ... affected the judgment of the jury." *Agurs,* 427 U.S. at 103, 96 S.Ct. 2392. As the district court noted, Morgan was one of two witnesses whose testimony specifically linked Jenkins to Reese's murder. He provided the only evidence of motive. The agreement implicates Morgan's credibility, a vital issue in a trial with only two substantive witnesses and no physical evidence linking the petitioner to the crime. The *Napue* Court observed that false evidence as to a witness's credibility can be "determinative of guilt or innocence." *Napue,* 360 U.S. at 269, 79 S.Ct. 1173; *accord Giglio,* 405 U.S. at 154, 92 S.Ct. 763; *DuBose v. Lefevre,* 619 F.2d 973, 979 (2d Cir.1980) ("[U]nquestionably, agreements ... to reward testimony by consideration create an incentive on the witness'[s] part to testify favorably to the State and the existence of such an understanding is important for the purposes of impeachment."). Here, the remaining testimony was weak or problematic. A jury might well have doubted the testimony of Napoleon, the only eyewitness, in light of his limited prior knowledge of Jenkins and Reese, the difficulty of accurate observation at night, and the stark inconsistencies and contradictions in his testimony.

We have further noted the heightened opportunity for prejudice where the prosecutor, by action or inaction, is complicit in the untruthful testimony. *See Mills,* 826 F.2d at 1195 ("[I]t is sufficient if [a] government attorney knows about the false testimony and no steps are taken to correct it."); *DuBose,* 619 F.2d at 978 (reversing denial of habeas writ because prosecutorial questioning fostered a "misapprehension [in the jury] that the State had not offered [the witness] any kind of deal") (internal citations and quotation marks omitted); *see also United States v. Pabisz,* 936 F.2d 80, 83 (2d Cir.1991) (finding that "the potential for misleading the jury was heightened by the prosecutor's summation"); *United States v. McElroy,* 697 F.2d 459, 463 (2d Cir.1982) (condemning "potentially misleading characterization[s]" by the prosecution that deceived defense counsel).

The respondent counters that Jenkins should be denied the writ because a "defendant [is] compelled to raise the issue at trial or not at all." Forgoing a challenge to false testimony, notes the respondent, may be strategically advantageous by strengthening arguments in support of a subsequent habeas petition. The respondent contends that gaming the system in this manner should be discouraged. *See Evans v. United States,* 408 F.2d 369, 370 (7th Cir.1969) (holding that a challenge based on knowing use of perjured testimony must be raised at trial).

■■■ But the case at bar does not require that we determine when a challenge to a state court judgment under *Napue* or *Giglio* should be denied for this reason because it seems clear to us that this case did not involve strategic or tactical omission. In *United States v. Helmsley,* upon which the respondent relies, we concluded that the defendant was "not only ... unable to establish a justifiable excuse for her failure to challenge ... testimony at trial, but it appear[ed] that her choice not to do so may have been deliberate." 985 F.2d 1202, 1209 (2d Cir.1993). We see nothing analogous here. Rather, Morgan's untrue testimony occurred during the course of defense counsel's attempt to

draw out of him testimony establishing the existence of the plea agreement. This failed attempt belies any suggestion of strategic or tactical omission. The trial judge knew the testimony was false because the court had been alerted to the existence of the plea agreement at the start of the trial. Moreover, defense counsel's failure to continue questioning Morgan or stress Morgan's self-contradictory testimony in summation is explained by the prosecution's behavior. Even if defense counsel thought that he had adequately established the plea agreement's existence in the course of his cross-examination, or that he could do so later in the proceedings, he was thwarted by the prosecutor's misleading examination on redirect. ADA Lendino averred at the trial's commencement that she would likely elicit the plea agreement's details in her direct examination of Morgan. Jenkins's counsel could not have anticipated her reinforcement of Morgan's false implication that there was no such bargain. And while Lendino's redirect questions elicited technically correct answers, by having Morgan testify that he had never met her before and had made no deals with her, they left the jury with the mistaken impression that no plea agreement existed. We can think of no credible explanation for her conduct other than an attempt to reinforce Morgan's false testimony.[2]

Finally, the prosecutor's actions cannot be overlooked on the ground that Jenkins's counsel did not continue to seek to gain an admission from Morgan as to the plea agreement. Further questioning by defense counsel could have prejudiced Jenkins. When a prosecutor throws his or her weight behind a falsely testifying witness, "challenging the witness's statement ... runs the risk of implicating the credibility of the prosecutor before the jury." *Helmsley*, 985 F.2d at 1207. Even prosecutorial silence "harm[s]" defendants, who are unable "to respond effectively." *Id.* (internal quotation marks and citation omitted); *see also United States ex rel Washington v. Vincent*, 525 F.2d 262, 268 n. 9 (2d Cir.1975) (noting that a defendant is harmed by his or her "inability to respond effectively in view of [the prosecutor's] silence").

## VI. The Weapons Possession Charge

■ Jenkins was also convicted of criminal possession of a weapon in the second degree. In granting the writ under § 2244, the district court did not say specifically that it granted the writ as to both convictions. Indeed, there is no analysis in the opinion or the briefs on appeal

---

**2.** The respondent's contrary suggestion, that ADA Lendino merely clarified the facts, is contradicted by the plain implication of the questions and reinforced by her comments in her summation. It is worth noting that New York's Code of Professional Responsibility mandates that a "lawyer shall not ... [k]nowingly use perjured testimony or false evidence." N.Y.Code of Prof'l Responsibility DR 7 102(A)(4), codified at 22 N.Y.C.R.R. § 1200.33(A)(4); *see also* Model Rules of Prof'l Conduct R.3.3 cmt. 4 (1999) ("When evidence that a lawyer knows to be false is provided by a person who is not the client, the lawyer must refuse to offer it regardless of the client's wishes."); *id.* R.3.3(a)(2) (proscribing an advocate's "fail[ure] to disclose a material fact, to a tribunal when disclosure is necessary to avoid assisting a ... fraudulent act by the client"); *id.* at R.3.3 cmt. 12 ("The general rule [is] that an advocate must disclose the existence of perjury with respect to a material fact, even that of a client. ....").

Prosecutors, whose duty is "to seek justice, not merely to convict," have "responsibilities different from lawyers in private practice." N.Y.Code of Prof'l Responsibility EC 7–13, codified at N.Y. Jud.App. In particular, "a prosecutor should not intentionally avoid pursuit of evidence merely because he or she believes it will damage the prosecutor's case or aid the accused." *Id.*

of the interrelationship among the false testimony of Morgan, the misbehavior of the prosecution, and Jenkins's conviction on the weapons charge. But inasmuch as the court directed the respondent to "release the petitioner from custody unless he is retried within 90 days," it is apparent that the court granted the writ for both the murder and the weapons possession convictions.

Our scrutiny of the trial transcript compels the conclusion that the district court was correct. Jenkins's weapons possession conviction rested on the same evidence as did his murder conviction: the testimony of Morgan and Napoleon. The indictment charged Jenkins with second degree weapons possession solely for the night of April 11, 1992, when Reese was murdered. Justice Giaccio instructed the jurors that to convict Jenkins on the weapons charge, they had to conclude beyond a reasonable doubt that Jenkins "on or about April 11, 1992, in the County of Queens, knowingly and unlawfully possessed a loaded firearm to wit a handgun, with intent to use unlawfully against another." Justice Giaccio told the jury that second degree weapons possession does not include possession of the weapon at home or at a workplace. In her opening argument, ADA Lendino also described Jenkins's crime as "recklessly engag[ing] in conduct which created a grave risk of death to Michael Reese by shooting him with a handgun and causing his death."

The only testimony proffered at trial that demonstrated Jenkins's possession of a firearm outside his home or workplace on April 11, 1992 came from Napoleon and Morgan. Unless the jury believed that Jenkins was the person who approached and shot Reese on April 11, 1992, it could not have found him guilty of the weapons possession charge. The prejudice flowing from Morgan's false testimony and the

prosecutorial conduct that enhanced his credibility tainted the testimony that was central to the weapons possession charge. We therefore affirm the judgment of the district court granting the writ of habeas corpus for both the murder and weapons possession charges.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.