RENDERED:  OCTOBER 2, 2020; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-0533-MR

JIMMY DEAN WILLIAMS                                    APPELLANT


APPEAL FROM KENTON CIRCUIT COURT
v.        HONORABLE PATRICIA M. SUMME, JUDGE
ACTION NO. 18-CR-00266


COMMONWEALTH OF KENTUCKY                               APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CALDWELL, DIXON, AND L. THOMPSON, JUDGES.

CALDWELL, JUDGE:  Jimmy Dean Williams appeals from a judgment of the

Kenton Circuit Court sentencing him to three concurrent twelve-year sentences for

robbery.  Williams argues the Commonwealth committed prosecutorial misconduct

by:  a) taking no action when a detective's testimony differed materially at a

suppression hearing and at trial, and b) making improper statements during closing

arguments. We agree with Williams that the Commonwealth failed to act in response to the detective's changing testimony, but Williams did not adequately preserve the issue, so precedent prevents Williams from receiving relief on appeal. We also affirm as to the challenged closing argument statements.

**RELEVANT FACTUAL AND PROCEDURAL HISTORY**

In November 2017, Jonah Killion drove his vehicle to a gas station in Bellevue, Kentucky. Killion's passengers, Devlin Carter and R.P. (a minor), spoke with a man they knew by the nickname of John Doe. After receiving a ride, Doe brandished a gun and took items like cell phones and a Michael Kors watch from Killion, Carter and R.P. After Doe fled, the three victims asked a man they encountered to call 9-1-1. Eventually, R.P. told the responding officer that the robber was John Doe, who used to live near him. R.P. called his mother to attempt to ascertain Doe's identity; R.P.'s mother called Doe's ex-girlfriend, who happened to be Carter's aunt, who said Doe's true name was Jimmy Williams.

Detective Corey Warner was soon assigned the case. He checked area pawnshops and learned Williams had recently pawned a Michael Kors watch. Warner interviewed Carter, who told Warner that Doe had dated his aunt. Ostensibly because Carter already knew Williams, Warner showed Carter a single photograph of Williams in lieu of a photo array and Carter identified Williams as the robber. Warner later interviewed R.P., who told Warner about being John

-2-

Doe's former neighbor. Again, Warner showed R.P. a single photo of Williams and R.P. identified Williams as the robber. Warner then interviewed Killion, who apparently had no prior acquaintance with Williams. As will be discussed, Warner's testimony about whether he showed any photos of Williams to Killion was wholly inconsistent.

In March 2018, Williams was indicted for three counts of robbery in the first degree, one count each for Carter, R.P., and Killion. Later that month, the Commonwealth made available to Williams in discovery numerous items, including a DVD containing Warner's interview with the victims. Thus, it is beyond serious dispute that both the Commonwealth and Williams knew, or certainly should have known, what occurred at the victim interviews long before Williams filed a motion in November 2018 asking for "an Order prohibiting the Commonwealth, during the trial of this action, from admitting any evidence of identification which is unduly suggestive and unreliable." The motion made no mention of Warner's interview with Killion but asserted the identifications by Carter and R.P. were inherently suggestive because Warner had shown each only one photo. The Commonwealth's written response asserted that "Killion stated [to Warner] he did not know the man who robbed them and was not shown any photos or asked to identify the subject."

In December 2018, the trial court conducted a hearing on Williams' motion to suppress. The Commonwealth asked Warner whether Killion knew the person who had robbed him. Williams' counsel objected on relevance grounds. In the ensuing discussion, the Commonwealth stated it believed the matter was relevant for, among other things, any in-court identification by Killion at trial and that it expected Warner to testify that he had not shown Killion a photo of Williams and thus any subsequent in-court identification of Williams by Killion would not be tainted.

After the court overruled Williams' objection, Warner testified that Killion did not say he knew who had robbed him. The Commonwealth then directly asked Warner if he had shown *any* photographs to Killion, and Warner answered, "I did not." When asked by the Commonwealth why he had not shown any photos to Killion, Warner explained that Killion—unlike R.P. and Carter—had stated he did not know the person who had robbed him, so Warner "didn't feel it was necessary at that time to, uh, produce a photo or photo lineup to Mr. Killion." Hammering the point home, the Commonwealth again asked if Warner had showed Killion a photo of Williams "at any point" and Warner again responded, "I did not." Williams' attorney did not explore on cross-examination whether Warner had, in fact, shown Killion any photos, nor did Williams' counsel play, or seek to introduce into evidence, the recording of Warner's interview of Killion.

-4-

The suppression hearing recessed and resumed the following Monday, December 10, 2018. In her closing argument, after asserting that Warner should have shown more photos to the victims, Williams' counsel said:

> The other thing that the Commonwealth's argument was is that he [Warner] never showed the pictures to each of the witnesses until he had already been given information that, um, they knew the suspect. And in fact in Jonah Killion's case that's not true. He received information that Jonah Killion in fact did not know the suspect, um, but had subsequently seen pictures of the suspect on Facebook and then he does actually show him a photo— Jonah Killion just doesn't positively identify that person as the assailant. So that is a large difference in what was testified to because the court was concerned with what the officer knew and could what the officer knew save the process used by the officer.

Counsel did not argue that Warner's testimony was perjurious or raise prosecutorial misconduct as a basis for relief.

In response, the Commonwealth did not address Warner's testimony about not having shown Killion any photos. The court orally denied the motion to suppress, remarking that it did not know if Warner had shown a photo to Killion during the interview but that, essentially, that matter did not impact its ruling. Williams' counsel asked if the court wanted the videos (presumably of the interviews between Warner and the victims) to be introduced into evidence, to which the trial court simply responded, "No." Williams' counsel did not seek to introduce the videos by avowal.

Two days later, the trial began. Because of his status as the lead police officer, Warner was present in the courtroom during the trial, including when Killion testified on the trial's first day. When Killion identified Williams as the robber, Williams' counsel objected, but did so by renewing the arguments raised in the motion to suppress, not based upon Warner's allegedly false suppression hearing testimony.

The next day, Warner testified. During direct examination, the Commonwealth oddly did not explore the issue of Warner's having shown any photos to Killion, but on cross-examination Williams' counsel asked Warner if he had shown Killion "the picture," to which Warner ramblingly responded:

> That is correct, after Mr. Killion had advised me prior to me showing the photo to him that he had seen the Defendant Jimmy Williams on Mary Pence's Facebook page. At that point he had already identified him to me by the Facebook page, so I didn't see any harm in showing him that photo at that point.

When Williams' counsel then asked if Killion had identified Williams from the photo shown to him by Warner, Warner replied that Killion was not completely sure the person in that photo was the robber but was sure that the person he had seen in a photo on Mary Pence's Facebook page was the robber. Warner added that the person depicted in the Facebook photo was Williams. Williams did not seek to introduce the tape of Warner's interview with Killion or seek any other affirmative relief based upon Warner's testimony. Surprisingly,

-6-

Williams did not even ask Warner why he had testified differently at the suppression hearing, nor did the Commonwealth address Warner's shifting testimony on redirect.

After the close of the evidence, the parties presented their guilt phase closing arguments, with the Commonwealth arguing in relevant part as follows:

> All of the interviews—all of the interviews—include them saying that this man [pointing towards Williams] robbed them. Now you heard [Williams' counsel] point out specific parts and you've had us stop this trial while we walk up and, you know, talk about impeachment and whether or not you said this or that. Why isn't the whole video [of the victims' encounters with the officer who responded to the 9-1-1 call] shown? Because all the other parts [objection by Williams' counsel] are consistent.

At an ensuing bench conference, Williams' counsel asserted the Commonwealth was commenting on matters not in evidence. The Commonwealth responded to the general effect that it could ask the jury to conclude that portions of the videos which Williams had not highlighted as showing inconsistencies in the victims' stories must therefore show consistency in those stories. The court overruled the objection, disjointedly stating that it was not sure the Commonwealth could say everything on the tapes not highlighted by the defense was consistent because the court did not know all that was said on those tapes. But the court ruled that the Commonwealth could comment that it noticed Williams had not played other parts

of the interviews, which would indicate those parts were consistent.  The jury

ultimately found Williams guilty of three counts of robbery, one for each victim.

The penalty phase then commenced.  After the brief presentation of

evidence (during which Williams was escorted from the courtroom due to

becoming disruptive), the parties gave their closing arguments.  During its closing

argument, the Commonwealth made the following three statements, each of which

Williams objected to:

> 1) I know we're all kind of drained and it gives me no joy
> being up here and asking for you to send someone to
> prison.  We're not doing this because it's something we
> wanna do.  Rather, it's something that we have to do.
> And we have to do that because of the verdict.  But,
> really, we have to do that to protect the community.
>
> 2)  As far as the Defendant's prior [conviction], yes, he
> was punished for that previous offense.  That also does
> have a bearing here because part of what you're being
> asked to assess is the danger to someone being returned
> to the community.
>
> 3)  This is someone who's made that mistake before,
> didn't seem to learn from it.  Already got the ten years,
> didn't change the behavior in any way.  So I'm asking for
> a higher sentence than that [the ten-year minimum].  In
> terms of the Defendant's outburst, I think it's pretty clear
> to all of us that there's no remorse here.  This is not
> someone who thought about what he did and feels
> bad[ly].  And make no mistake, he has a [sic] absolute
> constitutional right to a trial.  But, you know, someone is
> much less likely to be a danger in the future–

The trial court summarily overruled the first two objections and conducted a bench conference on the third, at which Williams' counsel noted the Commonwealth had three times referenced the protection of the community. Before the Commonwealth had begun to respond, the trial court remarked that it believed such arguments were "fair game" in the penalty phase and told Williams' counsel she could "take it up on appeal."

The jury recommended Williams receive a twelve-year sentence for each robbery conviction, to be served concurrently. After the trial court sentenced Williams in accordance with the jury's recommendation, he filed this appeal.

## ANALYSIS

### A. Issues Presented

Williams raises two overarching issues. First, he contends he is entitled to a new trial due to prosecutorial misconduct related to Warner's inconsistent testimony and, second, that the Commonwealth committed prosecutorial misconduct in its closing arguments.

### B. Warner's Shifting Testimony About His Interview with Killion

Williams now argues the suppression hearing was "[t]ainted by [p]erjured [t]estimony" (Appellant brief, p. 7) (emphasis omitted) and that the Commonwealth engaged in prosecutorial misconduct regarding Warner's evolving

testimony.[1]  However, Williams did not affirmatively raise those issues in the trial court.  Williams did not use the video of the interview to impeach Warner at the suppression hearing about his testimony that he had not shown Killion a photo and did not impeach Warner at trial with his contrary suppression hearing testimony.  Moreover, Williams did not allege perjury or prosecutorial misconduct as grounds for relief before the trial court.  Consequently, Williams' prosecutorial misconduct claims here are unpreserved.

Because the issue is unpreserved, we may only review it under the palpable error standard contained in Kentucky Rule of Criminal Procedure (RCr) 10.26, which provides that "[a] palpable error which affects the substantial rights of a party may be considered . . . by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error." However, our Supreme Court has held that "[a]bsent extreme circumstances amounting to a substantial miscarriage of justice, an appellate court will not engage in palpable error review pursuant to RCr 10.26 unless such a request is made and briefed by the appellant." *Shepherd v. Commonwealth*, 251 S.W.3d 309, 316 (Ky.

---

[1] It is undeniable that Warner testified incorrectly at either the suppression hearing or trial.  The issue is binary:  either Warner showed Killion a photo or not.  However, we decline to deem Warner's testimony perjurious since that was not robustly explored in circuit court.

2008). Incorrectly insisting the issue was properly preserved, Williams has not requested palpable error review.

Here, even if we were to somehow engage in *sua sponte* palpable error review, we could not grant Williams relief because the facts here fall squarely within the holding of the Supreme Court in *Meece v. Commonwealth*, 348 S.W.3d 627 (Ky. 2011). In *Meece*, the defendant's ex-wife, Regina Meade, testified that she had no agreements with the Commonwealth, but pretrial discovery showed that to be incorrect. *Id.* at 678-79. Like the case at hand, Meade was not "ever really pressed by the defense on her answers," the jury was never presented with information showing the falsity of her testimony, the trial court was never "asked to take judicial notice of the matter," and the Commonwealth avoided the subject on redirect. *Id.* at 679. Meece was convicted and sentenced to death. On appeal, he raised the same argument Williams raises: "his Due Process rights were violated by the prosecution's failure to correct Meade's testimony," and "her testimony was perjurous [sic] and this was known to the Commonwealth . . . ." *Id.* at 676.

Our Supreme Court affirmed, concluding Meece could not receive appellate relief when his counsel knew the testimony at issue was false and yet failed to impeach the witness. Because the discussion is directly relevant—indeed

fully resolves—the issues raised by Williams about Warner's testimony, we relate

the following analysis from *Meece*:

> "In order to establish prosecutorial misconduct
> . . . , the defendant must show (1) the statement was
> actually false; (2) the statement was material; and (3) the
> prosecution knew it was false.'" *Commonwealth v.
> Spaulding*, 991 S.W.2d 651, 654 (Ky. 1999) (*quoting
> United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir.
> 1989)). "When [such] perjured testimony could 'in any
> reasonable likelihood have affected the judgment of the
> jury,' the knowing use by the prosecutor of perjured
> testimony results in a denial of due process under the
> Fourteenth Amendment and a new trial is required."
> *Commonwealth v. Spaulding*, 991 S.W.2d 651, 655-56
> (Ky. 1999) (*quoting Giglio v. United States*, 405 U.S.
> 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)).
>
> This rule, however, does not apply if the
> defendant's failure to impeach the witness's allegedly
> false testimony is strategic or tactical. *Jenkins v. Artuz*,
> 294 F.3d 284, 295 (2d Cir. 2002). As was noted in
> *Jenkins*:
>
> > In *United States v. Helmsley*, . . . we
> > concluded that the defendant was "not only
> > . . . unable to establish a justifiable excuse
> > for her failure to challenge . . . [the]
> > testimony at trial, but it appear[ed] that her
> > choice not to do so may have been
> > deliberate." 985 F.2d 1202, 1209 (2d Cir.
> > 1993).
>
> *Jenkins*, 294 F.3d at 295. Thus,
>
> > *"[T]here is no violation of due
> > process resulting from prosecutorial non-
> > disclosure of false testimony if defense
> > counsel is aware of it and fails to object*."

-12-

> > *DeMarco v. United States*, 928 F.2d 1074, 1076 (11th Cir. 1991). "In [*United States v.*] *Decker*, [543 F.2d 1102, 1105 (5th Cir. 1976),] we held that the Government can discharge its responsibility under *Napue* [*v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L. Ed. 2d 1217 (1959)] and *Giglio* to correct false evidence by providing defense counsel with the correct information at a time when recall of the prevaricating witnesses and further exploration of their testimony is still possible." *United States v. Barham*, 595 F.2d 231, 243 n. 17 (5th Cir. 1979).

*Beltran v. Cockrell*, 294 F.3d 730, 736 (5th Cir. 2002).

Therefore,

> > *[T]he fact that the alleged statement was known to petitioner and his counsel during the trial compelled petitioner to raise this issue then or not at all. When a criminal defendant, during his trial, has reason to believe that perjured testimony was employed by the prosecution, he must impeach the testimony at the trial, and "cannot have it both ways. He cannot withhold the evidence, gambling on an acquittal without it, and then later, after the gamble fails, present such withheld evidence in a subsequent proceeding."*

*Evans v. United States*, 408 F.2d 369, 370 (7th Cir. 1969) (*quoting Green v. United States*, 256 F.2d 483, 484 (1st Cir. 1958)); *See also Decker v. United States*, 378 F.2d 245, 251 (6th Cir. 1967).

. . .

Meece complained of this "falsified testimony" in his pro se motion for a new trial filed prior to his sentencing. And, as demonstrated by his pre-trial motion to exclude "false testimony," he knew the law on this subject as well as anyone in the courtroom. *Thus, whether the misstatement by Meade was intentional or innocent under the circumstances, given that no explanation for his failure to impeach Meade is given or apparent from the context of the alleged occurrence, one may only conclude that the failure to impeach Meade upon this allegedly false statement was strategic and tactical.*

*Id.* at 679-80 (emphasis added).

The same fundamental analysis applies here. Long before the relevant proceedings, Williams received discovery materials (the video of Warner's interview with Killion) which could have been used to show that Warner testified incorrectly at the suppression hearing or at trial. Yet Williams did not impeach Warner at either proceeding, nor did Williams ask the trial court for any affirmative relief based upon prosecutorial misconduct. Like the Court in *Meece,* we must conclude Williams' counsel made a conscious, strategic choice to not fully address the issues in the trial court. Therefore, we cannot find palpable error. After all, if perjured testimony *in a case in which the defendant received the death penalty* was insufficient to warrant appellate relief, Warner's incorrect testimony in this case cannot entitle Williams to palpable error relief.[2]

_____

[2] It is not clear whether Williams still challenges the propriety of the identifications by the three victims. To the extent Williams raises such a challenge, we affirm. An identification procedure

-14-

Despite Williams not being entitled to relief, we are disappointed by the Commonwealth's utter failure to even try to rectify Warner's malleable testimony. In language still applicable today, Kentucky's then-highest court explained ninety years ago that the Commonwealth's goal is to seek justice, not convictions:

> It has been often written that a prosecuting attorney should act impartially and see that justice is fairly meted out, which requires fair dealing with an accused in calling him to account for his crime. It is his duty to see that the legal rights of the accused, as well as those of the commonwealth, are fully protected; to prosecute and not persecute; to conduct himself with due regard to the proprieties of the office. He represents the people of the state, and in a degree should look after the rights of a person accused of a crime by endeavoring to protect the innocent and seeing that truth and right shall prevail.

---

focusing only on one person may be deemed suggestive. *Duncan v. Commonwealth*, 322 S.W.3d 81, 96 (Ky. 2010). However, even if we assume, for purposes of argument, that the identification procedure used by Warner was "unduly suggestive" we cannot conclude that Williams satisfied the second step, which requires a court to determine "whether, in light of the totality of the circumstances, the suggestive procedures created 'a very substantial likelihood of irreparable misidentification.'" *Id.* at 95 (quoting *Simmons v. United States*, 390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968)). Both RP and Carter knew Williams prior to the robberies and Killion did not positively identify Williams from the photo shown to him by Warner. We find no clear error in the trial court's factual findings nor any abuse of discretion in its ruling on the admissibility of the identification evidence. *Duncan*, 322 S.W.3d at 95 (setting forth those standards of review). In short, under the totality of the circumstances, Williams is not entitled to relief because the identification procedures did not create a substantial likelihood of irreparable misidentification.

*Bennett v. Commonwealth*, 234 Ky. 333, 28 S.W.2d 24, 26 (1930). The

Commonwealth's utter silence in response to Warner's testimony is startling and

inexplicable.

Indeed, Kentucky Supreme Court Rule (SCR) 3.130(3.3)(a)(1) forbids

an attorney from "mak[ing] a false statement of fact or law to a tribunal or fail[ing]

to correct a false statement of material fact or law previously made to the tribunal

by the lawyer . . . ." The Commonwealth asserted in both its written response to

Williams' motion to suppress and in oral statements at the hearing that Warner had

not shown Killion any photographs. If the Killion interview tape depicts Warner

showing Killion a photograph, which seems likely, we harbor grave concerns about

whether the Commonwealth complied with SCR 3.130(3.3)(a)(1).

Similarly, SCR 3.130(3.3)(a)(3) prevents an attorney from offering

evidence which is known to be false. That subsection also requires an attorney to

take "reasonable remedial measures" if the attorney later learns that its witness has

offered false, material evidence. It is inescapable that Warner testified falsely at

either the suppression hearing or at trial, yet the Commonwealth took *no

remediation efforts whatsoever at either proceeding*. Thus, we also harbor doubts

about whether the Commonwealth complied with SCR 3.130(3.3)(a)(3).

### C. The Commonwealth's Closing Arguments

### 1. Application of the Standards of Review

"An appellate court may reverse for prosecutorial misconduct occurring during closing argument only if the misconduct is 'flagrant' or if: (1) the proof of guilt is not overwhelming, (2) an objection is made, and (3) the trial court failed to admonish the jury after sustaining the objection." *Mayo v. Commonwealth*, 322 S.W.3d 41, 55 (Ky. 2010). A court must find that a defendant satisfies all three factors to grant relief for non-flagrant prosecutorial misconduct— in other words, relief is unavailable for non-flagrant misconduct if the evidence against a defendant is "overwhelming" because the misconduct would then be a harmless error. *Dickerson v. Commonwealth*, 485 S.W.3d 310, 329 (Ky. 2016).

The evidence against Williams was overwhelming. Although Warner's method of procuring identifications from the victims was idiosyncratic, two of the three victims knew Williams before the robberies and were positive he robbed them, and the third victim unhesitatingly identified Williams at trial.[3] Therefore, we may analyze the challenged comments only for flagrant misconduct.

The test to determine if a prosecutor's comments rise to the level of flagrant misconduct is: "(1) whether the remarks tended to mislead the jury or to

---

[3] Since it is undisputed that: a) Killion was with R.P. and Carter at the time of the robbery, b) one person robbed all three victims, and c) R.P. and Carter positively identified Williams as the robber, it logically follows that Williams also robbed Killion.

prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused." *Mayo*, 322 S.W.3d at 56 (citation omitted). If there is a state of "relative equipoise" because two of the four factors favor a defendant and two favor the Commonwealth, we conduct "an examination of the trial as a whole" to ascertain whether the comments undermined its "essential fairness . . . ." *Id.* at 57.

## 2. The Guilt Phase Statement

One of the main thrusts of Williams' defense was some alleged inconsistencies in statements given by the victims. Indeed, almost immediately after Williams' counsel began her penalty phase closing argument she said: "this case comes down to whether or not you believe the evolving nature of the stories of the three young men that were in the car on that night." Towards that end, Williams' counsel highlighted some alleged inconsistencies in the three victims' interactions with the officer who responded to the 9-1-1 call, including playing portions of the video of that interaction to the jury. In its guilt phase closing argument, the Commonwealth argued that the portions of the videos not shown to the jury were not helpful to Williams (*i.e.*, showed the victims' statements were consistent).

We agree with Williams that the Commonwealth Attorney should "confine his or her argument to the facts in evidence . . . ." *Childers v. Commonwealth*, 332 S.W.3d 64, 73 (Ky. 2010), *overruled on other grounds by Allen v. Commonwealth*, 395 S.W.3d 451 (Ky. 2013). And the unplayed portions of the recording(s) were not in evidence. However, "[i]t is well-established that the Commonwealth may respond to comments made by defense counsel during closing arguments . . . ." *Ordway v. Commonwealth*, 391 S.W.3d 762, 795-96 (Ky. 2013). The Commonwealth was thus permitted to respond to Williams' argument that the victims' stories were exculpatorily inconsistent.

In addition, "the prosecutor is entitled to draw reasonable inferences from the evidence, make reasonable comment upon the evidence and make a reasonable argument in response to matters brought up by the defendant . . . [and] is given wide latitude in making arguments to the jury . . . ." *Childers*, 332 S.W.3d at 73. Although better practice here perhaps would have been to seek to play the whole interview tapes to the jury, it was not inherently illogical or impermissible for the Commonwealth to assert that the jury could reasonably infer that the parts of the tapes not highlighted by the defense were favorable to the Commonwealth.

Even if we were to conclude that the comment was improper, it was isolated, Williams has not shown how it misled the jury or prejudiced him unduly,

-19-

and the evidence against Williams was strong. Thus, Williams would not be entitled to relief.

### 3. The Penalty Phase Statements

Williams argues the Commonwealth three times made "send a message" arguments in its penalty phase closing argument. Our Supreme Court has held that it generally disapproves of those arguments: "Any effort by the prosecutor in his closing argument to shame jurors or attempt to put community pressure on jurors' decisions is strictly prohibited. Prosecutors may not argue that a lighter sentence will 'send a message' to the community which will hold the jurors accountable or in a bad light." *Cantrell v. Commonwealth*, 288 S.W.3d 291, 299 (Ky. 2009). However, in the penalty phase alone, the Commonwealth is permitted to make "send a message" arguments so long as the argument is "channeled down the narrow avenue of deterrence." *Id.*

We do not find the three challenged statements by the Commonwealth asked the jury to "send a message." Our Supreme Court has given a pluperfect example of a "send a message" argument: "the whole town is depending on you to find the defendant guilty and lock him up for a long time so as to send a message to all the other criminals in the community that this town is not going to put up with this type of criminal activity." *Ordway*, 391 S.W.3d at 797. Here, the Commonwealth did not attempt to cajole or coerce the jury to recommend a stiff

sentence to "send a message" to the community or other criminals about the community's approach to crimes.

Instead, the thrust of the Commonwealth's comments was to encourage the jury to give Williams a sentence significant enough to protect the community, considering Williams' criminal history and the nature of the crimes for which that same jury had just found him guilty. Our Supreme Court has "caution[ed] the Commonwealth that it is not at liberty to place upon the jury the burden of doing what is necessary to protect the community." *Commonwealth v. Mitchell*, 165 S.W.3d 129, 132 (Ky. 2005). But for nearly eighty years Kentucky precedent has also recognized that the "true purpose" of criminal prosecutions "is to protect the public by punishing the criminal and preventing crime." *Frazier v. Commonwealth*, 291 Ky. 467, 165 S.W.2d 33, 34 (1942). *Accord Cantrell*, 288 S.W.3d at 298.

Although there appears at first blush to be some tension between the statement in *Mitchell* that the Commonwealth cannot place the burden to protect the community on the jury and the statements in *Frazier* and *Cantrell* that protecting the public is a purpose of our criminal law system, we understand the cumulative impact of those holdings to be that the Commonwealth may ask for a sentence sufficient to protect the community in light of that defendant's criminal history and the seriousness of the offenses for which the defendant had just been

convicted. But the Commonwealth may not assert that the jury is the entity charged with protecting the community. For example, it would be improper for the Commonwealth to argue: "You, the jurors of Kenton County are all that stands between safety and lawlessness. The whole community is depending on you for its safety, so please give this Defendant the maximum sentence."

In short, the Commonwealth may do what it did here: ask a jury to recommend a sentence sufficient to help protect a community, considering the defendant's offenses and criminal history. Our conclusion that the Commonwealth did not cross the line here is buttressed by the fact that the Commonwealth did not ask the jury to recommend a maximum sentence and agreed with Williams' counsel that these robberies were not the "worst of the worst." And it is plain that the jury was not inflamed against Williams since its twelve-year total sentencing recommendation is almost the minimum possible sentence.

In sum, we do not find the comments—singularly or cumulatively—to be improper. Accordingly, we readily conclude Williams is not entitled to relief based upon flagrant prosecutorial misconduct.[4]

---

[4] Even if we engaged in a flagrancy determination, Williams would not be entitled to relief. Arguably, two factors favor Williams (intentional comments which occurred three times) and two favored the Commonwealth (no misleading of the jury/prejudice to Williams and strong evidence against Williams). Given that state of equipoise, we would have looked to the entire trial to assess whether the remarks undermined its fundamental fairness. *Mayo*, 322 S.W.3d at 57. On balance, we cannot say the three statements were so overwhelmingly improper as to undermine the fairness of the trial as a whole, or even just the penalty phase.

## CONCLUSION

For the foregoing reasons, Jimmy Dean Williams' conviction and sentence are affirmed.

THOMPSON, L., JUDGE, CONCURS.

DIXON, JUDGE, CONCURS IN RESULT ONLY.

BRIEFS FOR APPELLANT:

Travis Bewley
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Jenny L. Sanders
Assistant Attorney General
Frankfort, Kentucky