# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 10, 2012 Session

## STATE OF TENNESSEE v. BRENDA WOODS

**Appeal from the Circuit Court for Hardeman County**
**No. 2010-CR-95     J. Weber McCraw, Judge**

_____

**No. W2011-02366-CCA-R3-CD - Filed December 13, 2012**

_____

The defendant, Brenda Woods, was convicted by a Hardeman County jury of three counts of procuring an illegal vote, a Class E felony, and was sentenced by the trial court to concurrent terms of two years for each offense, with credit given for one day's jail service and the remainder of the time on supervised probation. The defendant was also disqualified from holding public office for the duration of her sentence pursuant to Tennessee Code Annotated section 40-20-114(a). She raises the following four issues on appeal: (1) whether the prosecutor engaged in misconduct that deprived her of a fundamentally fair trial; (2) whether the trial court erred by overruling her Batson challenge to the prosecutor's exercise of a peremptory challenge; (3) whether the evidence is sufficient to sustain her convictions; and (4) whether the trial court erred by allowing testimony from an investigator about his telephone conversations with her. Following our review, we reverse and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Reversed and Remanded for New Trial**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

C. Michael Robbins, Covington, Tennessee (on appeal); and David A. Stowers and Daryl Gray, Bolivar, Tennessee (at trial), for the appellant, Brenda Woods.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; D. Michael Dunavant, District Attorney General; and Bob Gray, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

# FACTS

This case arises out of the defendant's role in assisting disqualified voters to vote in the May 2009 Bolivar Municipal Election, in which the defendant was an unsuccessful mayoral candidate and successful candidate for city council. Following the election, the Hardeman County Administrator of Elections received a list of convicted felons, cross-referenced it against her list of voters, and discovered that several individuals with felony records, including Yolanda Giles, Taletha McNeal Traylor, and Amos Watkins, had registered to vote and voted illegally in the early voting of the 2009 election. An investigation ensued that resulted in those three voters being indicted for illegal voting and the defendant's being indicted for three counts of procuring an illegal vote and one count of procurement or inducement of false swearing on a voter registration form. The last count, however, was not brought before the jury and was subsequently dismissed.

## State's Proof

At trial, Amber Moore, Administrator of Elections for Hardeman County since 2005, described the responsibilities and duties of her office, which includes processing voter registration applications and executing elections. She said that an individual registers to vote by filling out and signing an application to register to vote, which requires him or her to state his or her name, social security number, and date and place of birth and to answer a series of questions, including whether he or she has ever been convicted of a felony. Once the application is approved, the individual is mailed a voter registration card that allows him or her to vote in the next election, provided the application was approved thirty days before the election.

Moore testified that convicted felons are disqualified from voting unless they have had their voting rights restored. She said she regularly picks up copies of convictions from the Hardeman County Circuit Court Clerk's Office and enters them into her computer software system. If her records show that a convicted felon is a registered voter, her office purges the individual from the registered voter list and sends the voter a letter stating that he or she has been purged due to the felony conviction, along with information on the procedure for restoring voting rights. Moore acknowledged that it was not a perfect system and that there were some instances in which individuals with felony convictions "slip[ped] through" and remained on the voter registration list despite their felony convictions. She said she relied not only on the record of convictions from the court clerk's office, but also on the individual voters to be truthful about their felony convictions.

Moore explained the procedure required for convicted felons to have their voting rights restored, testifying that individuals are required to take a certificate of restoration form

provided by her office to the circuit court clerk of the court in which the conviction occurred and to their probation officers for those parties to fill out the appropriate portions of the form. When the form is completed with the appropriate signatures, the individual returns the form to Moore's office and she sends it to the Coordinator of Elections of the Secretary of State's Office. Moore stated that an individual's voting rights would not be restored until she received a return letter from the State of Tennessee approving the restoration.

Moore testified that she was very familiar with the defendant, who had been a candidate "in some capacity" in nearly every election since Moore had been Administrator of Elections in Hardeman County. The defendant had picked up both voter application and certificate of restoration forms from Moore's office and had been "active in the political process" by assisting voters in registering to vote or in filling out their restoration forms and by picking up voters in a van and bringing them to the polls. The defendant also frequently called Moore's office to determine the registration status of voters or to ask if particular individuals had voted yet.

Moore testified that after the May 19, 2009 Bolivar Municipal Election, she received a list of convicted felons from the Department of Correction, checked it against the list of individuals who had voted in that election, and learned that several individuals with felony convictions whose voting rights had not been restored had voted illegally during the early voting period for the election. Among these were Yolanda Giles, who had been convicted of delivery of less than .5 grams of cocaine, a Class C felony, on April 18, 1997, and who registered to vote on January 28, 2009; Taletha McNeal Traylor, who had been convicted of two counts of forgery, a Class E felony, on October 12, 1995, and who registered to vote on May 17, 2006; and Amos Watkins, who had been convicted of aggravated assault, a Class D felony, on June 8, 2001, and who registered to vote on April 15, 1997, and again on May 1, 2009, because his address had changed. After receiving the information, Moore purged their names from the voting list and sent them notices of the purging along with restoration applications. She also referred their names to the district attorney for investigation and prosecution.

On cross-examination, Moore acknowledged that, at the time of the May 2009 election, all three of the above individuals were eligible to vote according to her office's records.

Linda Fulghum, the Circuit Court Clerk for Hardeman County, identified the certified copies of the judgments of conviction for Yolanda Giles, Taletha Traylor, and Amos Watkins. Her Deputy Court Clerk, Rhonda Sipes, estimated that over the years she had encountered the defendant approximately ten times in the clerk's office as the defendant sought to get different individuals' voting rights restored. She said the defendant sometimes

-3-

accompanied the individuals who were trying to have their rights restored and sometimes came to the office alone. For her part, Sipes checked to ensure that the individuals in question had fulfilled their fine and restitution obligations and then filled out the court clerk's portion of the form, signed as an officer of the court, and returned the form to either the defendant or the individual with instructions to take it to the state probation officer for him to fill in his portion and sign off on the form.

Yolanda Giles, a distant relative and casual acquaintance of the defendant, testified that she filled out her application to vote, checking "no" to the question of whether she had ever been convicted of a felony, because she needed proof of residence to obtain her driver's license. She knew at the time she filled out the application that her felony conviction prevented her from voting, but she had no intention of participating in the voting process at that time.

Giles further testified that sometime before the May 2009 Bolivar Municipal Election, she mentioned to the defendant that she could not vote because of her felony record. She said the defendant told her that she could have her voting rights restored by completing some paperwork. Giles testified that she replied to the defendant that she had heard about that process briefly in church but had not gotten any details. She said she did not tell the defendant that she had not applied to have her voting rights restored, and the defendant never specifically questioned her about it.

Later, the defendant stopped by her home while campaigning for the May 2009 municipal election. The defendant reminded her that it was early voting and that she should vote, and she replied that she had lost her voter registration card. The defendant responded that she would get her a new voter card, that the card should arrive within a certain number of days, and that if it did not, Giles should call to let her know. Three or four days later, Giles received her new voter registration card in the mail.

Giles testified that the defendant called her to make sure that she had received her new voter registration card and then returned to her house in a church van driven by Larry McKinnie to give her a ride to the Election Commission to vote. Giles said that she and the defendant had no discussions that day about her felony record or whether she had had her voting rights restored. She then explained that she assumed it was lawful for her to vote because the defendant had come to her house to campaign after their conversation about her felony record. She testified:

> Well, they came by campaigning and the conversation, like I said, I had heard briefly in church about felons being able to vote, I didn't get all the details there but when I was talking to [the defendant] she did mention that and

-4-

I figured, okay, well, I didn't have any need to question her because I figured [the defendant] knew what she was talking about.

Giles also testified on direct examination that she was facing criminal charges in connection with voting in the May 2009 election and that she had not been promised anything by the State in exchange for her testimony.

Amos Watkins testified that he had known the defendant, who was a friend of his sisters, for his entire life. Sometime before the May 2009 election, the defendant came by his aunt's home in a church van driven by Larry McKinnie. The defendant was campaigning and asked Watkins if he would go vote for her. Watkins said he told the defendant that he "didn't know if [he] could vote or not, [if he] had a felony or not." He stated that the defendant went back to the van, picked up a telephone, and, five or ten minutes later, returned to him and said, "Come on. You can vote." He, therefore, got on the van and "went and voted."

Watkins further testified that he did not realize that his aggravated assault conviction prevented him from lawfully voting. He said he had been charged with illegal voting, that the charges were still pending against him, and that he had not been promised anything in exchange for his testimony. On cross-examination, he said he did not even know he had a felony conviction until he was arrested for illegally voting in the 2009 election; had he known he had a felony, he "wouldn't never have voted."

Debbie Jones, who was dating Amos Watkins at the time of the May 2009 election, testified that the defendant, who was her cousin, came by her home while campaigning to ask for her vote. She said that when she told the defendant that she could not vote because she was a felon, the defendant asked her where Watkins was. She replied that he was probably at his aunt's house but that she did not know if he could vote because he also had a felony. According to Jones, the defendant responded that she would "look into it."

On cross-examination, Jones denied that she was angry at the defendant because she had stopped her practice of raising funds to help pay Jones's utility bill. She acknowledged that she had pled guilty to making a false report but insisted that her guilty plea conviction for passing worthless checks was actually for writing bad checks, not passing them.

Taletha McNeal Traylor, who said she was a distant relative and acquaintance of the defendant, testified that she filled out her voter registration application in May 2006, checking "no" to the question of whether she had ever been convicted of a felony, strictly for "identification verification"; she had no intention of voting at that time. She stated that during the first week of May 2009 she was sitting on the front porch of her neighbor's house

with four or five other people listening to music and drinking beer when the defendant and McKinnie, who was driving a church van, pulled up in front of the house campaigning for votes. Traylor stated that the defendant told the assembled group that it was early voting and that she wanted them to come vote. Traylor said when she answered that she was a felon, the defendant replied, "Well, come on. I'm taking you anyway. Y'all, let's go vote." According to Traylor, the defendant also told her and her friends that they could bring their beer with them. She said that she and her companions therefore got on the van with their alcohol and went and voted. Traylor testified that she was currently facing charges for illegal voting and that the State had not promised her anything in exchange for her testimony.

Tennessee Bureau of Investigation Special Agent David Harmon of Memphis, who was called in by the district attorney to conduct an independent investigation of the case, testified that he telephoned the defendant on March 3, 2010, in an attempt to arrange an interview with her. During that conversation, the defendant told him that she had been "fighting 400 years of oppression in Hardeman County," that his investigation was "a bunch of bullshit," and that the "D.A. Mighty Mouse was running around trying to ruin her." The defendant also stated that Agent Harmon "knew what this was all about" and that she would "give [him] a statement when the Sheriff's daughter, Diane Hicks, Michael Miller's sister, and Monroe Woods were indicted for voter fraud." Agent Harmon testified that the defendant told him that those three people voted illegally in Hardeman County, accused him of being "a little rusty on [his] election law," and hung up on him.

Agent Harmon testified that he called the defendant back on March 11, telling her again that he needed to interview her about the voter fraud complaint he was investigating. He said that the defendant stated that the investigation was "bullshit," that "this incident was going to be like the Rosa Parks but bigger," and that she was "going to put Hardeman County on the map and everyone would know what was going on." Agent Harmon testified that the defendant ended with "bring on with what you got," before once again hanging up on him.

**Defendant's Proof**

Larry McKinnie, a retired Tennessee state trooper and former boyfriend of the defendant, testified that during the two weeks of early voting for the May 2009 Bolivar Municipal Election, he drove the defendant through neighborhoods campaigning and canvassing for people to pick up and take to early voting. He said the defendant asked the individuals they encountered if they were registered to vote and if they would be willing to come along to participate in early voting. He stated that if anyone said he had a felony, they did not take him to vote. Instead, the defendant, who was more familiar with the process than he, would explain to the person the procedure for getting his or her voting rights restored. McKinnie also stated that he never allowed anyone with alcohol on the van or

anyone who appeared intoxicated to vote.  Finally, he testified that Agent Harmon, when interviewing him, asked,"I'm just curious of why they're after [the defendant]."  He said he replied that it was because the defendant was an advocate for the people and that when one stands up, "people want to knock you down."

Pamela Turner testified that on the day she voted during the early voting period of the May 2009 Bolivar Municipal Election, she saw Amos Watkins and Debbie Jones parked in the Dollar General store parking lot across the street from the voting precinct.  She said that Jones told her they were there because Watkins was going to vote but that she could not vote because she had a felony.  According to Turner, Watkins said he had a felony too, but he was going to vote anyway because "what they don't know won't hurt them."  Turner further testified that Jones had told her in the hallway outside the courtroom that she and Watkins were being paid for their testimony and that when they went to court, they would not have to worry because they were going to get probation.  On cross-examination, Turner acknowledged that she did not see Watkins vote.

Gwendolyn Sue Brown, a friend of the defendant, testified that she campaigned with the defendant every day during the early voting period of the 2009 election and never saw Amos Watkins or Yolanda Giles on the van.  She saw Taletha Traylor on the van, but she did not have any alcohol with her and did not appear to be intoxicated.  On cross-examination, Brown denied having told Agent Harmon that the election she had worked with the defendant and Larry McKinnie was the 2008 presidential election.

Teresa Golden, the defendant's cousin, testified that she was a candidate for a city council position in the 2009 Bolivar Municipal Election and campaigned with the defendant and never heard her tell anyone that it was all right to vote if he or she was a felon.

Kenneth Kowen testified that he and the defendant were adversaries in the 2009 Bolivar mayoral race.  He said their paths crossed several times while they were campaigning, and he never overheard her tell anyone that it was all right to vote with a felony.  He stated that after the election, he, McKinnie, and the defendant discovered "at least a dozen instances of irregularities" in the voter list for the election, including a deceased voter and several other voters who were dementia patients in assisted care facilities.  He testified that he first went to the district attorney with his concerns but that he was unresponsive so he wrote a letter to Attorney General Eric Holder.  On cross-examination, he testified that the Department of Justice had not yet responded to his complaint.

The defendant testified that she had done "many wonderful things" for the community, including registering hundreds of people to vote, restoring the voting rights of numerous felons, and transporting hundreds of disenfranchised voters to the polls each

election. She said that she "one hundred percent" knew the process for restoring a felon's right to vote and always carried certificates of restoration with her while campaigning. If an individual she encountered told her that he had a felony, she would ask if his fines and restitution were paid and if he had completed his probation. If he responded in the affirmative, she would immediately fill out a certificate of restoration for him and then take it to either the court clerk's office or the state probation office for completion.

The defendant testified that she did not register Amos Watkins, Taletha Traylor, or Yolanda Giles to vote and never picked up Amos Watkins or Yolanda Giles to take to the polls. She took Taletha Traylor to the polls for the 2009 election, but they never had any conversation about Traylor's criminal record and she had no idea that she had a felony conviction. She did not see Traylor or anyone else with alcohol on the van. Furthermore, as a teetotaler whose strong views about alcohol were well-known, she "certainly wouldn't allow anybody . . . that was drunk go to the polls and vote."

On cross-examination, the defendant asserted that it was Moore's job, not hers, to purge disqualified voters from the registered voter list and complained that Moore had "failed the system" by allowing convicted felons to vote in the election. The defendant described herself as "an activist in [the] community" and a "hero" to the disenfranchised people of the county. She said she knew election law better than the Tennessee Bureau of Investigation agent who had attempted to interview her and claimed that she had "never violated any election laws, none." However, she then acknowledged that she had, at times, violated the distance regulation by campaigning too close to the polls. She testified that she had contacted the Tennessee Bureau of Investigation, the Federal Bureau of Investigation, and the district attorney numerous times to complain about voter fraud in various Hardeman County elections but that the system was so corrupt that no one ever listened to her concerns. Finally, she claimed that the witnesses against her were lying and that she was the victim of selective prosecution by the district attorney.

## ANALYSIS

### I. Prosecutorial Misconduct

The defendant contends that the prosecutor engaged in misconduct by assuring the trial court and defense counsel that there were no promises of immunity to the main prosecution witnesses, eliciting testimony from each witness that he or she was still facing prosecution in his or her voter fraud case, and arguing in closing that there were no agreements between those witnesses and the State when, in fact, an "obscure" immunity statute prohibited the State from prosecuting the voter fraud cases following the witnesses' testimony in the defendant's trial. The defendant argues that the prosecutor's statements

constituted "half-truths" that bolstered the credibility of the prosecution's witnesses by implying that they had nothing to gain from their testimony. Under the facts of this case, in which the credibility of these witnesses was crucial to the jury's findings of guilt, we agree with the defendant that the testimony elicited by the prosecutor and argued to the jury at closing was sufficiently misleading as to deprive the defendant of her due process rights to a fair trial.

In addition to eliciting testimony on direct examination from each disqualified voter that he or she was still facing criminal charges and had not been promised anything in exchange for his or her testimony, the district attorney and assistant district attorney made the following statements during their closing arguments to the jury:

> Each and every one of those witnesses told you from that witness stand that there was no agreement with the State of Tennessee regarding the charges that were filed against them for casting those illegal votes. Each and every one of them still face those criminal charges. They are under felony indictment. Their case is set for, I believe, the January term for disposition. No promises. That's what they said.
>
> . . . .
>
> And by her actions on May 1, May 6 and May 8 of 2009, she helped those convicted felons, those disqualified voters, she helped them violate the very fundamental and principles of democracy. She victimized them. They're facing criminal charges now, again, and she violated the peace and dignity of the State of Tennessee.

On the date of the defendant's sentencing, judgments were entered for Giles, Traylor, and Watkins showing that all charges against them had been dismissed "pursuant to TCA § 2-19-137." The defendant bases her prosecutorial misconduct argument on the fact that the prosecutors, throughout the trial, were apparently aware of that statute, which reads:

> **2-19-137. Violators as witnesses–Exemption from prosecution.**–A person offending against any of the provisions of this chapter shall be a competent witness against any other person violating any provisions of this chapter, and may be compelled to attend and testify upon any trial, hearing, proceeding, or investigation in the same manner as any other person, but the testimony so given shall not be used in any prosecution or proceeding, civil or criminal, against the person so testifying, except for perjury in giving such testimony, *and a person so testifying shall not thereafter be liable to*

-9-

*indictment, prosecution, or punishment for the offense with reference to which such testimony was given, and may plead or prove the giving of such testimony accordingly in bar of such an indictment or prosecution.*

Tenn. Code Ann. § 2-19-137 (2003) (emphasis added).

We agree with the defendant that the plain language of the above statute provides that Giles, Traylor, and Watkins could not have been prosecuted on their illegal voting charges following their testimony in the defendant's trial. We also agree with the State that the information conveyed to the jury through the prosecutor – that the witnesses were still facing charges at the time of the defendant's trial and had not been promised anything in exchange for their testimony – was technically true because the dismissal of the charges against these witnesses occurred pursuant to statute rather than as the result of any immunity agreement, formal or informal, conveyed by the State. However, while true, the information was misleading because it implied that the witnesses had no personal motives for testifying at the defendant's trial other than to tell the truth.

At the hearing on the motion for new trial, the district attorney said that everything he and the assistant district attorney said at the defendant's trial was true and that nothing was hidden from the defendant because the immunity statute was "right there for [defense counsel] to read and interpret and know." He also pointed out that defense counsel had ample opportunity to cross-examine the witnesses about their knowledge of the immunity statute or to argue it in closing, and he said that defense counsel was ineffective for failing to do so.

We are not suggesting that the prosecutor had any duty to direct defense counsel's attention to the immunity statute, which is located in the same chapter on "Prohibited Practices" as the offenses for which the defendant was on trial. The prosecutor did, however, have a duty not to intentionally elicit testimony that was misleading to the jury. The prosecutor also had a duty not to use that misleading information in closing argument in an attempt to bolster the credibility of its witnesses. "That a statement standing alone is factually correct obviously does not mean that it cannot mislead based on the natural and reasonable inferences it invites." Jenkins v. Artuz, 294 F.3d 284, 294 (2d Cir. 2002) (concluding that prosecutor's attempt to bolster credibility of government witness by accurately pointing out to the jury that the witness never made a deal with her, without also telling the jury that the witness had made a plea agreement with a different prosecutor, violated the defendant's due process rights). Furthermore, this court has previously observed that a defendant's due process rights may be violated even when defense counsel is aware of false or misleading information if the prosecutor "'capitaliz[es] on it in closing argument or by posing misleading questions to the witnesses.'" State v. Kevin Douglas Davis, No.

M2000-00017-CCA-R3-CD, 2001 WL 741930, at *7 (Tenn. Crim. App. July 3, 2001) (quoting Mills v. Scully, 826 F.2d 1192, 1195 (2d Cir. 1987)). Because this was a close case that turned on witness credibility, we conclude that the defendant's due process rights to a fair trial were violated by the prosecutor's having intentionally elicited misleading information and argued that misleading information to the jury in closing. We, therefore, reverse the defendant's convictions and remand for a new trial.

Although we have determined that the defendant is entitled to a reversal of her convictions and a new trial, we will, given the possibility of further appellate review, also address the defendant's other issues.

## II. Jury Selection

The defendant contends that the trial court committed reversible error by overruling her Batson challenge to the prosecutor's exercise of a peremptory challenge to strike an African-American female venire member from her jury. The State argues that the trial court did not abuse its discretion in overruling the defendant's challenge because the record shows that the State provided a non-discriminatory reason for the use of its peremptory challenge. We agree with the State.

In Batson v. Kentucky, 476 U.S. 79 (1986), and cases that followed, the United States Supreme Court set out the procedure by which a trial court is to evaluate claims of racial or sexual discrimination in the jury selection process. To raise a Batson claim, the defendant must first make a prima facie showing of purposeful discrimination against a venire member. Batson, 476 U.S. at 93-94. This may be done by showing that the totality of relevant facts, considered together, raises an inference of purposeful discrimination: "This showing may include proof of systemic exclusion, substantial underrepresentation on the venire, or the selection methods and results solely in the present case." Woodson v. Porter Brown Limestone Co., Inc., 916 S.W.2d 896, 902 (Tenn. 1996) (citing Batson, 476 U.S. at 95).

Once the defendant has established a prima facie case of discrimination, the burden of production then shifts to the State to offer a race-neutral explanation for the exercise of its peremptory challenge. Batson, 476 U.S. at 97; Purkett v. Elem, 514 U.S. 765, 767 (1995). This explanation "must be based on something more than stereotypical assumptions, but it need not rise to the level required to justify the exercise of a challenge for cause." State v. Ellison, 841 S.W.2d 824, 826 (Tenn. 1992) (citing Batson, 476 U.S. at 97). The race-neutral explanation need not be "persuasive, or even plausible." Purkett, 514 U.S. at 768. If there is no discriminatory intent inherent in the explanation, it will be deemed race-neutral. Id. (citation omitted).

Finally, the trial court must consider the totality of the circumstances to determine if the race-neutral explanation offered by the State is actually a pretext for purposeful discrimination. Batson, 476 U.S. at 97-98. "Because the core issue is the prosecutor's discriminatory intent, or lack thereof, the trial court's finding 'largely will turn on evaluation of credibility.'" Ellison, 841 S.W.2d at 827 (quoting Batson, 476 U.S. at 98 n.21). The best evidence of discriminatory intent "'often will be the demeanor of the attorney who exercises the challenge.'" Id. (quoting Hernandez v. New York, 500 U.S. 352, 365 (1991)). "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." Purkett, 514 U.S. at 768.

In its determination of whether a peremptory challenge has been exercised on discriminatory grounds, the trial court "'must carefully articulate specific reasons for each finding on the record, i.e., whether a prima facie case has been established; whether a neutral explanation has been given; and whether the totality of the circumstances support a finding of purposeful discrimination.'" State v. Hugueley, 185 S.W.3d 356, 369 (Tenn. 2006) (quoting Woodson, 916 S.W.2d at 906). The trial court's findings are entitled to great weight and will not be set aside on appeal unless found to be clearly erroneous. Woodson, 916 S.W.2d at 906; State v. Carroll, 34 S.W.3d 317, 319 (Tenn. Crim. App. 2000).

The defendant raised her second Batson challenge after the State exercised a peremptory challenge to strike a female African-American venire member. Defense counsel stated, without objection from the State, that the prospective juror was the third female African-American in a row struck by the State.[1] The trial court found that the defendant had made out her prima facie case of discrimination and asked the State to offer its race neutral reason for the exercise of the challenge. The prosecutor replied that an officer had observed that the prospective juror, upon entering the courtroom, had greeted the defendant in a "friendly," "familiar," and "jovial" manner. The prosecutor also stated that the prospective juror was the only person that the defendant spoke to and that the prospective juror's demeanor appeared to change when he questioned her about her ability to be fair and impartial.

The trial court accepted the race-neutral explanation and overruled the defendant's Batson challenge. In its ruling, the trial judge observed that the prospective juror having engaged in conversation with the defendant, which showed some kind of relationship between the two, combined with his notes indicating that she said she worked with the defendant's daughter and knew the defendant's father, provided a sufficient race-neutral

---

[1] The trial court overruled the defendant's first Batson challenge after accepting the State's proffered race-neutral explanation that the venire member's son had been tried in the previous court term for voter fraud.

basis for the prosecutor's challenge. The trial court's ruling states in pertinent part:

> I'm not going to get the officer up here. The Court does find that the State is entitled to certain challenges. Again, as I made notes on several of these, it's a very small town, people know each other but [the prospective juror] indicated she worked with [the defendant's] daughter, that she knew [the defendant's] father, and apparently not only a relationship with those two, but apparently she has a relationship with [the defendant] so that there was apparently conversation in the courtroom today. Again, we're trying to get impartial jurors. A familiarity with the daughter, the father, and [the defendant] certainly raises an issue of whether or not she could set those aside and be fair. The Court finds that based on those relationships, that those are legitimate reasons for a challenge.

The defendant correctly points out that the trial court apparently confused the prospective juror with another venire member who was excused for cause after answering that she worked with the defendant's daughter and knew the defendant's father and did not think she could be fair in her deliberations. We disagree, however, with the defendant's assertion that the "alleged friendly and jovial conversation" between herself and the prospective juror "played only a bit part in the trial court's ruling" or that the trial court's mistake regarding the prospective juror's relationships with the defendant's family members rendered its decision erroneous. Clearly, the trial court based its ruling not only on its erroneous belief that the prospective juror knew the defendant's father and worked with the defendant's daughter, but also on the fact that the prospective juror demonstrated a close enough personal relationship with the defendant to give her a friendly greeting and engage her in conversation.

At the hearing on the motion for new trial, the prospective juror adamantly denied that she greeted the defendant in a friendly way or spoke to her in the courtroom. She also said that she did not personally know the defendant, had never worked with the defendant's daughter, and knew the defendant's father only in a general way because he had "come and worked on [her] water." Her claims, however, were partially contradicted by Special Agent Harmon, who testified that he witnessed the prospective juror enter the courtroom, exchange friendly waves with the defendant, and engage her in conversation for ten to fifteen seconds before taking her seat. He further testified that he pointed out their behavior to the prosecutor.

Special Agent Harmon's report of the friendly exchange between the defendant and the prospective juror was sufficient, in and of itself, to support the trial court's finding that there was no discriminatory intent in the prosecutor's exercise of his peremptory challenge.

We conclude, therefore, that the defendant is not entitled to relief on the basis of this issue.

### III. Sufficiency of the Evidence

The defendant next contends the evidence is insufficient to support her convictions. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Thus, we must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

The defendant was convicted of procuring an illegal vote, in violation of Tennessee Code Annotated section 2-19-117, which makes it a Class E felony for "any person to procure, aid, assist, counsel or advise another to vote in any convention, primary or final election, knowing such person is disqualified." Tenn. Code Ann. § 2-19-117 (2003).

The defendant argues that the evidence is insufficient to show beyond a reasonable doubt that she aided or assisted Yolanda Giles and Amos Watkins to vote in the 2009 Bolivar Municipal Election or that she had actual knowledge of the disqualified status of Giles, Watkins, and Taletha Traylor at the time of the election. In support, she cites, among other things, the "vague" testimony given by Watkins about his own knowledge of his felony conviction and the defendant's role in transporting him to the election, the fact that Giles was unable to say exactly when her conversation with the defendant about her felony record took place and testified that she did not mention her felony conviction when the defendant specifically approached her about voting in the May 2009 election, and the various defense witnesses who contradicted the testimony provided by the three main prosecution witnesses. The defendant also asserts that Giles, Watkins, and Traylor are accomplices to the crime whose testimony about the defendant's knowledge of their disqualification to vote was uncorroborated by any other evidence.

The State responds by arguing that the three disqualified voters are not accomplices to the crime because they could not have been indicted or convicted of the same offense as the defendant. The State further argues that the evidence, when viewed in the light most favorable to the State, is sufficient to sustain the convictions. We agree with the State.

An accomplice is one who "knowingly, voluntarily, and with common intent participates with the principal offender in the commission of the crime alleged in the charging instrument." State v. Griffis, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997). The test for determining whether a witness is an accomplice is whether the witness could be indicted for the same offense as the defendant. See State v. Green, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995); State v. Lawson, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). When the evidence is clear and undisputed that a witness participated in the crime, then the trial court must declare the witness to be an accomplice as a matter of law and instruct the jury that the witness's testimony must be corroborated. Lawson, 794 S.W.2d at 369. On the other hand, when the evidence is unclear, it becomes a question of fact for the jury to determine whether the witness is an accomplice and, if so, whether there is corroborating evidence to support the witness's testimony. Id.; see Green, 915 S.W.2d at 831-32.

Although the three disqualified voters who testified for the State were indicted for illegal voting, they could not have been indicted or convicted of procuring an illegal vote. Thus, they were not accomplices whose testimony had to be corroborated. We note, moreover, that there was some corroborating testimony of the defendant's knowledge of the disqualification of at least one of the three, as Debbie Jones testified that she told the defendant that Watkins was a felon and that she did not think he was eligible to vote.

In sum, when viewed in the light most favorable to the State, the evidence showed that

the defendant, who by her own acknowledgment is well-versed in election law, "procured, aided, and assisted" those three individuals to vote in the 2009 Bolivar Municipal Election, knowing that they were disqualified to vote due to their felony convictions, by encouraging them to participate in early voting and picking them up in a church van and carrying them to the polls. We conclude, therefore, that the evidence is sufficient to sustain the defendant's convictions.

### IV. Testimony by Special Agent Harmon

Finally, the defendant next contends that the trial court committed reversible error by ruling that her telephone conversations with Special Agent Harmon were admissible under the party opponent admission exception to the rule against hearsay. The defendant argues that her statements were not hearsay and should have been excluded as either irrelevant or unfairly prejudicial to her case. The defendant further argues that, even if the trial court was correct in ruling that her statements constituted hearsay that fell within a recognized exception to the rule against hearsay, it should have still excluded them under Tennessee Rules of Evidence 401, 402, and 403 as irrelevant and unfairly prejudicial.

Agent Harmon's specific testimony regarding his first telephone conversation with the defendant was as follows:

> I placed a phone call to her and during that conversation [the defendant] told me that she has been fighting 400 years of oppression in Hardeman County. [The defendant] stated that this investigation was a bunch of bullshit. [The defendant] stated that the D.A. Mighty Mouse was running around trying to ruin her. [The defendant] stated that I knew what this was all about. [The defendant] stated that she would give me a statement when the Sheriff's daughter, Diane Hicks, Michael Miller's sister, and Monroe Woods were indicted for voter fraud. [The defendant] stated that these people voted illegally in Hardeman County. [The defendant] stated that I was a little rusty on my election law and hung up the phone on me.

Agent Harmon testified that in the second telephone conversation the defendant

> stated that this investigation was bullshit. [The defendant] stated that this incident was going to be like the Rosa Parks but bigger. [The defendant] stated that she was going to put Hardeman County on the map and everyone would know what was going on. [The defendant] then stated, quote, "bring on with what you got," end quote, and hung up the phone again on me.

A hearsay statement is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As stated in Tennessee Law of Evidence,

> [H]earsay is present if the out-of-court statement must be true to be relevant. Thus, for hearsay it is important whether the declarant is telling the truth. . . . The reason for this principle is that hearsay evidence is excluded because of concerns that the declarant's credibility cannot be adequately tested. If the declarant's credibility is irrelevant because it does not matter whether the declarant is telling the truth, the dangers of hearsay are not present and the statement is not viewed as hearsay.

Neil P. Cohen et al., Tennessee Law of Evidence, § 8.01[4][i] (5th ed. 2005). Whether a challenged statement is hearsay is a question of law that is subject to *de novo* review. State v. Gilley, 297 S.W.3d 739, 760 (Tenn. Crim. App. 2008) (citing State v. Schiefelbein, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); Keisling v. Keisling, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)).

"Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Nonetheless, even if relevant, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Among her statements to Agent Harmon, the defendant claimed "400 years of oppression in Hardeman County"; that the investigation was "a bunch of bullshit"; that other persons whom she named should be indicted for voter fraud; and that Agent Harmon "was a little rusty on [his] election law." Additionally, she made derogatory remarks about the district attorney general. At trial, these wide-ranging statements were lumped together as one "statement," rather than considered individually, with the result that the trial court was never asked to determine whether each individual statement was hearsay, or otherwise excludable under the rules of evidence. We note, however, that in her trial testimony, the defendant made clear her feelings toward the prosecution about the charges against her and of the individuals involved. Thus, even if the trial court erred in allowing Agent Harmon to testify about his conversations with the defendant, the error was harmless, for her trial testimony echoed the sentiment of her earlier telephone statements.

## CONCLUSION

Based on the foregoing authorities and reasoning, we reverse the judgments of the trial court and remand for a new trial.

_____
ALAN E. GLENN, JUDGE